FILED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

99 APR 13 PM 2: 49

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| BUFFALO ROCK CO., INC., | ) |
| Plaintiff, | ) |
| vs. | ) CV-97-BU-0672-S |
| UNITED STATES OF AMERICA, | ) |
| Defendant. | ) |

ENTERED

APR 1 3 1999

FINDING OF FACTS AND CONCLUSIONS OF LAW

The plaintiff, Buffalo Rock Company, Inc., filed this action seeking to recover income tax and interest it claims were erroneously and illegally assessed and collected by the defendant, United States of America (Internal Revenue Service) for the calendar year 1991. The dispute centers on the proper valuation of three non-competition agreements. A non-jury trial was held on February 24, 1999, during which the parties presented evidence, including expert testimony. The Court has reviewed the transcript and exhibits, as well as the parties' post-trial briefs. The Court finds that the value of the non-competition is the present value of the total amounts to be paid under each agreement: (1) Talladega agreement, $672,290; (2) Jasper agreement, $871,573; and (3) West Alabama agreement, $777,930.

I.  FINDINGS OF FACT

Pursuant to Fed. R. Civ. P. 52, the Court makes the following findings of fact:

16

At issue in this case is the valuation of three non-compete agreements entered into by Buffalo Rock. The three agreements are referred to herein as (1) the Talladega agreement; (2) the Jasper agreement; and (3) the West Alabama agreement. The evidence is undisputed that the agreement was negotiated at arm's length. The dispute at issue is whether the negotiated amount paid for the agreements was "reasonable." The parties presented evidence as to the contract amount of each agreement, the present value of each agreement, and the fair market value of each agreement. Each agreement will be discussed separately.

  A. TALLADEGA AGREEMENT

In 1989, Buffalo Rock acquired substantially all of the assets of MBA Marketing, the Pepsi Cola, Seven-Up and Sunkist bottler for the Talladega area. Buffalo Rock negotiated a non-competition agreement with Charles Wilson, the owner. The agreement provided that Mr. Wilson would not compete against Buffalo Rock for five years. In return for relinquishing the right to compete, Buffalo Rock agreed to pay Mr. Wilson a total of $ 1 million over ten years.

Buffalo Rock's expert, Peter Ketchum of American Appraisal Associates, computed that present value of the agreement was $672,290. Mr. Ketchum calculated the fair market value of the non-compete agreement using essentially the same methodology as the IRS's expert, Mark Mitchell of Business Valuation Services, Inc. Each expert calculated the probability that Mr. Wilson would compete against Buffalo Rock without an agreement at 50%. However, the two experts disagreed as to the factor used for income loss that would result if Mr. Wilson engaged in competition. Mr. Ketchum used 25% income loss and Mr. Mitchell used 15% income loss. This disparity in the predicted percentage of lost income resulted in a disparity of the assessment of the fair market value of the non-compete agreements: Mr, Ketchum found the fair market value of the agreement was

$830,000; Mr. Mitchell found the fair market value of the agreement was $588,000.

    B.    JASPER AGREEMENT

The Jasper transaction is distinguished by the other two agreements in this case because William Scheile did not have the bottling franchise agreement in the Jasper area. Buffalo Rock held the bottling franchise, but, through agreements, he had been allowed to act as the distributor in that area. In 1991, Buffalo Rock decided to terminate the agreement with Mr. Scheile and, basically, forced Mr. Scheile out of the Pepsi and Dr. Pepper distributorship in Jasper. Buffalo Rock and Mr. Scheile entered into a non-compete and consulting agreement with Mr. Scheile whereby Buffalo Rock agreed to pay Mr. Scheile $1.3 million over a ten-year period in return for Mr. Scheile relinquishing the right to compete for five years.

Buffalo Rock's expert computed the present value of the agreement as $ 871,573. Similar to the Talladega agreement, the experts disagreed as to the factor used for income loss that would result in the event Mr. Wilson engaged in competition. Mr. Ketchum used 25% income loss and Mr. Mitchell used 15% income loss. Moreover, the experts disagreed as to the probability that Mr. Scheile would compete without an agreement. Mr. Ketchum found that, due to the particular circumstances surrounding Mr. Scheile, it was 100% probable that Mr. Scheile would compete against Buffalo Rock without an agreement. Mr. Mitchell utilized a 50% probability factor; he testified that, in performing his calculations, he was without specific information affecting the probability of competition.

This disparity in the probability of competition factor and the predicted percentage of lost income resulted in a disparity of the assessment of the fair market value of the non-compete agreements: Mr. Ketchum found the fair market value of the agreement was $ 940,000; Mr. Mitchell

found the fair market value of the agreement was $ 285,000.

C.    WEST ALABAMA AGREEMENT

In 1988, Buffalo Rock acquired substantially all of the assets of West Alabama Bottling Company, Inc., the Pepsi and Seven-Up bottler for the Tuscaloosa area. Buffalo Rock negotiated non-competition agreements with James Duren, Jr. and Ann Montgomery.[1] The agreement provided that Mr. Duren and Ms. Montgomery would not compete against Buffalo Rock for five years. In return for relinquishing the right to compete, Buffalo Rock agreed to pay Mr. Duren and Ms. Montgomery a total of $ 1 million over five years.

Buffalo Rock's expert computed the present value of the agreement as $ 777,930. Each expert calculated the probability that Mr. Duren and Ms. Montgomery would compete against Buffalo Rock without an agreement at 50%. However, the two experts disagreed as to the factor used for income loss that would result if they engaged in competition. Mr. Ketchum used 25% income loss and Mr. Mitchell used 15% income loss. This disparity in the predicted percentage of lost income resulted in a disparity of the assessment of the fair market value of the non-compete agreements: Mr. Ketchum found the fair market value of the agreement was $ 550,000; Mr. Mitchell found the fair market value of the agreement was $ 262,000.

II.   CONCLUSIONS OF LAW

As a general rule, a taxpayer is "allow[ed] as a depreciation deduction a reasonable allowance for the exhaustion, wear and tear (including a reasonable allowance for obsolescence) . . . (1) of property used in the trade or business, or (2) of property held for the production of income." 26

---

[1] Buffalo Rock also negotiated a non-compete agreement with Timothy Duren, which is not at issue in this case.

U.S.C. § 167(a). "The basis on which exhaustion, wear and tear, and obsolescence are to be allowed in respect to any property shall be the adjusted basis provided in section 1011, for the purpose of determining the gain on the sale or other disposition of such property." *Id.* (c)(1). Section 1011 defines adjusted basis as the cost of the property less certain adjustments not at issue in this case. 26 U.S.C. § 1011 (citing 26 U.S.C. §§ 1012, 1016).

Intangible assets, such as the non-competition agreements at issue in this case, may be amortizable over the their useful life if the assets have an ascertainable value and a limited useful life, the duration of which can be determined with reasonable accuracy. *Newark Morning Ledger Co. v. United States*, 507 U.S. 546, 558, 113 S. Ct. 1670, 1677, 123 L. Ed. 2d 288 (1993)(quoting *Houston Chronicle Publishing Co. v. United States*, 481 F.2d 1240, 1250 (5th Cir. 1973). The parties before this Court do not dispute that the non-competition agreements are amortizable; the dispute is limited to the basis on which the amortization deduction will be allowed. In other words, what is the value of the agreements?

Buffalo Rock contends that the basis of the agreements for purposes of calculating their amortization deduction is the entire contract price, the sum total of all payments to be made. The Court notes that "[t]he amount a taxpayer pays or allocates to a covenant not to compete is not always controlling for tax purposes. . . . A covenant not to compete must have 'economic reality'; i.e., some independent basis in fact or some relationship with business reality so that reasonable persons might bargain for such an agreement." *Howard Pontiac-GMC, Inc. v. Commissioner*, 1997 WL 369362 (U.S. Tax Ct.) 74 TCM (CCH) 45, TCM (RIA) ¶ 97,313 (Tax Ct. July 8, 1997). As a preliminary matter, "the value ascribed to the covenant must be reduced to reflect its present value." *Id.* The IRS contends that the basis is the fair market value of the agreements as determined by its

expert witness.

The Court accepts Plaintiff's expert's testimony as to the present value of the noncompetition agreements. Moreover, the Court finds that Plaintiff's expert's determination that the present value of the agreements is a "reasonable" amount, approximating the fair market value of the agreements, is correct. The Court further finds that any amounts payable under the agreements above the present value of the noncompetition agreements is imputed interest.

### III. CONCLUSION

Therefore, this Court finds the value of the subject agreements to be as follows:

1. Talladega Agreement: $672, 290;

2. Jasper Agreement: $871,573; and

3. West Alabama Agreement $777,930.

**The parties are hereby ORDERED to submit a proposed order, calculating the amount of refund, if any, based on the Court's determination of the is a value of the agreements, on or before WEDNESDAY, APRIL 21, 1999.**

DONE this 13th day of April, 1999.

H. DEAN BUTTRAM, JR.
UNITED STATES DISTRICT JUDGE